**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| MARC WILLIAM REEVES, | CASE NO. 1:15-cv-00619-CCC-GBC |
| Plaintiff, | (JUDGE CONNER) |
| | (MAGISTRATE JUDGE COHN) |
| v. | |
| CAROLYN W. COLVIN, COMMISSIONER OF SOCIAL SECURITY, | REPORT AND RECOMMENDATION TO VACATE THE DECISION OF THE COMMISSIONER AND REMAND FOR FURTHER PROCEEDINGS |
| Defendant. | Docs. 1, 9, 10, 18, 19 |

## REPORT AND RECOMMENDATION

### I.    Procedural Background

On August 5, 2012, Marc William Reeves ("Plaintiff") filed as a claimant for disability benefits under Title II and XVI of the Social Security Act, 42 U.S.C. §§ 401-34, 1181-1183f, with a date last insured of December 31, 2011,[1] and disability onset date of January 15, 2009. (Administrative Transcript (hereinafter, "Tr."), 14). After the claim was denied at the initial level of administrative review, the Administrative Law Judge (ALJ) held a hearing on December 30, 2013. (Tr.

---

[1] Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. 42 U.S.C. §§ 415(a) and 416(i)(1). The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." *See* 42 U.S.C. § 416(i)(2); *accord Renfer v. Colvin*, No. 3:14CV611, 2015 WL 2344959, at *1 (M.D. Pa. May 14, 2015).

593-629).   On January 28, 2014, the ALJ found that Plaintiff was not disabled within the meaning of the Act.   (Tr. 11-33).   Plaintiff sought review of the unfavorable decision, which the Appeals Council denied on February 12, 2015, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner.  (Tr. 1-7).

On March 27, 2015, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) and pursuant to 42 U.S.C. § 1383(c)(3), to appeal a decision of the Commissioner of the Social Security Administration ("SSA") denying social security benefits.  (Doc. 1).  On June 5, 2015, the Commissioner ("Defendant") filed an answer, an administrative transcript of proceedings, and supplement to the transcript.  (Doc. 9, 10, 11).  On October 16, 2015, Plaintiff filed a brief in support of the appeal.  (Doc. 18 ("Pl. Brief")).  On November 17, 2015, Defendant filed a brief in response.  (Doc. 19 ("Def. Brief")).  On July 30, 2015, the Court referred this case to the undersigned Magistrate Judge.

## II.   Relevant Facts in the Record
### A. Education, Age, and Vocational History

Plaintiff was born in June 1978 and was classified by the Regulations as a younger individual through the date of the ALJ decision. (Tr. 26); 20 C.F.R. § 404.1563(c).  Plaintiff has a history of treatment for his psychological symptoms for over decade prior to his alleged onset disability date.  (Tr. 264-73, 313-14 ). He completed two years of college (Tr. 212).  Plaintiff asserts that he is disabled

due to impairments from bipolar disorder, anxiety, depression, personality disorder, and obsessive compulsive disorder.  (Tr. 211); Pl. Brief at 2.

### B. Relevant Treatment History and Medical Opinions

### 1.    Tioga Counseling Center: David August, D.O.

In an initial report dated April 22, 2010 Dr. August noted that Plaintiff had been treated at Northern Tier Psychiatry but had an interruption in his care, had not been seen by a doctor in approximately a month and has been off Buspar for thirty days and Abilify for forty-five days.  (Tr. 388).  Dr. August noted that Plaintiff reported that his symptoms had improved after stopping Abilify and that he was likely suffering from the side-effect of akathisia.  (Tr. 388).  However, Plaintiff reported that the Buspar helped slow his speech, calm him, and alleviate his anxiety.  (Tr. 388).  Dr. August noted that Plaintiff's main problems have been manic behavior and that he:

> gets impatient and hyperactive and talks too fast. His mind races and he can't sleep. He has problems with poor judgment and severe irritability. He may develop paranoid thoughts at these times and think that people are talking about him. He has difficulty controlling his anger at these times and can become very confrontational, belligerent, and sarcastic. Sometimes [Plaintiff] gets down and withdrawn and is very sad.  He is always anxious and he worries excessively about a variety of things that he really does not need to worry about. Sometimes he is overly perfectionistic.

(Tr. 388-89).   With regards to Plaintiff's medication history, Dr. August summarized:

> His current medications are: Buspar 30 mg, one and a half twice per day; Clonazepam 1 mg, two at bedtime and one or two per day; Depakote 500 mg, two at bedtime and one in the morning; Lithium Carbonate 300 mg, two twice per day; and Trazodone 100 mg, one or two po q h.s. As previously noted, [Plaintiff] has been off the Abilify, which was prescribed at 20 mg at bedtime. He has been off of this for forty-five days. [Plaintiff] has been on other medications in the past that have not been very helpful for him. These would include Luvox and Paxil, which did not help him; and Zyprexa and Seroquel both made him over-sedated. . . . [Plaintiff] has been on Risperdal in the past. It sounds like he had severe extrapyramidal symptoms affecting his tongue from that medication.

(Tr. 389).  Dr. August also noted that Plaintiff had a head and neck injury from a moto vehicle accident in 2000 and surgery for hernia repair.  (Tr. 389).  Dr. August noted that Plaintiff:

> has had a lot of difficulty working and has lost jobs due to mood swings and abhorrent behavior. He is out of work at this time. He lives with his father. One job he lost for falling asleep on the job. In the past, he has worked as a night auditor, a general laborer, and a test technician.

(Tr. 389).  Upon examination, Dr. August observed that Plaintiff was:

> friendly and cooperative and was awake and alert. He was one day off on the date, but knew the month and year. He could immediately recall three words, and after a minute he could only remember two. He could spell the word world forward, but could not spell it backwards. [Plaintiff] seems to have some problems with racing thoughts, and has some problems with concentration and focus. He also seems to be anxious. He is a fair historian. His thought processes were not always logical and goal directed. He has some amount of flight of ideas, but did not have any looseness of associations. He is experiencing no paranoia at this time. He does not hear voices talking to him from people that are not there. He does not seem to have visual hallucinations. His insight was fair and judgment was fair. Affect was elevated. Speech was somewhat rapid.

(Tr. 390).  Dr. Augusts' diagnostic impression was: 1) Bipolar Disorder, Type I, most recent episode manic, severe, without psychotic features; 2) generalized anxiety disorder; 3) Tourette's disorder; and, 4) obsessive-compulsive personality traits.  (Tr. 390).  Dr. August assessed Plaintiff with a GAF score of 50.  (Tr. 391). Dr. August prescribed Buspar, Clonazepam, Depakote, Lithium Carbonate, and Trazodone.  (Tr. 391).  Dr. August discussed the potential risks and side effects of all of his medications including, but not limited to, the risk of priapism from Trazodone, kidney damage from Lithium, liver damage and weight gain from Depakote, and addiction and dependence from Clonazepam.  (Tr. 391).  Dr. August concluded that Plaintiff appeared to be in "a very mildly hypomanic state at this time" and safe for outpatient treatment.  (Tr. 391).

On May 21, 2010, Plaintiff reported that he felt improvement with his medication changes and that he was frustrated that he has been unable to find work.  (Tr. 387).  Dr. August noted that Plaintiff was "somewhat overly talkative" and had some problems with concentration.  (Tr. 387).  Dr. August noted some flight of ideas and assessed Plaintiff with a GAF of 50.  (Tr. 387).  Dr. August concluded:

> I talked to him for quite some time today about his situation with being unemployed. I am not sure that he can behave normally enough to work. I hope he will try and get some kind of job so we can establish his work functioning ability. He may be a candidate for applying for government disability.

(Tr. 387).

On June 22, 2010, Plaintiff showed "signs of significant improvement with very good mood stability." (Tr. 386). Dr. August observed that Plaintiff acted "very normally in the office," he was "overly talkative, as always," and less significant flight of ideas. (Tr. 386). Dr. August observed that Plaintiff was not speeded up and not irritable. (Tr. 386). Dr. August assessed Plaintiff with a GAF score of 60. (Tr. 386). Dr. August wrote that the laboratory test results show that Plaintiff is on adequate doses of his medications and that the medications are not hurting him. (Tr. 386). Dr. August noted that Plaintiff has not received any job offers and that he is going to keep trying. (Tr. 386). Dr. August concluded that Plaintiff "has improved enough to work at this time." (Tr. 386).

On July 20, 2010, Dr. August noted that Plaintiff seemed "pretty stable" and "doing reasonably well." (Tr. 385). Dr. August noted that Plaintiff was "acting quite normally in the office," remained "overly talkative," and did not seem to have much in the way of flight of ideas. (Tr. 385). Dr. August noted that Plaintiff was not irritable or speeded up. (Tr. 385). On September 10, 2010, Plaintiff reported being "[s]tressed out more than usual," not sleeping well, and irritable. (Tr. 384). Dr. August increased the Trazadone dosage and assessed Plaintiff with a GAF score of 55. (Tr. 384).

On November 10, 2010, Plaintiff reported that he was sleeping a lot more, doing well, and not as stressed out.  (Tr. 384).  Dr. August assessed Plaintiff with a GAF score of 60.  (Tr. 384).  On January 20, 2011, Plaintiff reported feeling "a bit more depressed."  Dr. August noted that Plaintiff exhibited lower energy and his affect was lower than usual.  (Tr. 384).  Dr. August assessed Plaintiff with a GAF score of 58.  (Tr. 384).  Dr. August wrote that he would consider tapering off one of Plaintiff's medications and substituting a new medication for the next visit.  (Tr. 384).

On March 18, 2011, Plaintiff reported that Buspar "never really did much" and runs him down.  (Tr. 383).  Dr. August observed that Plaintiff was mildly depressed and a little talkative.  (Tr. 383).  Dr. August adjusted Plaintiff's medication and assessed Plaintiff with a GAF score of 60.  (Tr. 383).  On April 18, 2011, Plaintiff reported that he had been trying to get a job without success.  (Tr. 382).  Plaintiff reported that the higher dose of Lithium gives him more energy and improves his mood, but then he can't sleep.  (Tr. 382).  Dr. August observed that Plaintiff:

> continues to act in a peculiar manner. He was acting in a peculiar manner in the office today. He brought in his mother who updated me about some of [Plaintiff's] odd behaviors. He was friendly and cooperative, about but kept asking the same questions over and over again. He has difficulty socializing normally and interacting with people normally. . . . He is very obsessive and compulsive today.

(Tr. 382).  Dr. August adjusted Plaintiff's medications and assessed Plaintiff with a GAF score of 58.  (Tr. 382).  Plaintiff asked if he should apply for disability to which Dr. August wrote that he felt Plaintiff would "probably unemployable due to his peculiar behaviors. He would annoy his boss and coworkers to the point that he would get fired if he were given a job."  (Tr. 382).

On November 23, 2011, Plaintiff reported that he kept trying to get jobs but it was very hard and he cannot keep one.  (Tr. 381).  Plaintiff stated, "They say I act strangely."  (Tr. 381).  Dr. August wrote that Plaintiff "does act very strangely and nobody really wants to hire him."  (Tr. 381).  Dr. August noted that Plaintiff was, had "a lot of tics and blinking," had a lot of obsessive thinking and repeated himself "over and over again."  (Tr. 381).  Dr. August assessed Plaintiff with a GAF score of 50.  (Tr. 381).  Dr. August noted that Plaintiff had been having bladder infections, which an ER doctor attributed to his Trazodone.  (Tr. 381).  Dr. August opined that Plaintiff seemed to have deteriorated since April 18, 2011, and explained that the next appointment would be the last as Dr. August was no longer going to work at the clinic.  (Tr. 381).

On December 19, 2011, Plaintiff stated that he was "kind of nervous" because he needed to file for bankruptcy and Dr. August noted that Plaintiff was "somewhat anxious."  (Tr. 380).  Dr. August observed that Plaintiff "actually look[ed] quite good."  (Tr. 380).  Dr. August noted that Plaintiff no longer had any

bladder infections since he stopped taking Trazodone.  (Tr. 380).  Dr. August adjusted Plaintiff's medications and informed him that this would be his last meeting since the clinic was closing.  (Tr. 380).

### 2.    Concern Counselling Services: Diane Andreason, BA; William Shapiro, M.D.; Robin Allis, M.S.W.; Teresa Fairchild-Pitcher, C.R.N.P; Jatinder Babbar, Psy.D; Nicole Mullen, M.S.; Pamela Kipp, M.S.W.

In a record dated November 18, 2011, it was noted that Plaintiff experienced problems with anxiety, dealing with people, precarious nature of conversations, temper/anger management, utilizing coping skills when experiencing anxiety/social relations, and trust issues.  (Tr. 392).  It was noted that Plaintiff was not satisfied with his employment status and was actively seeking employment. (Tr. 392). It noted that Plaintiff was hospitalized for five days in 1998 due to suicidal ideation.  (Tr. 393).  Plaintiff reported that he had difficulty falling and staying asleep and difficulty waking up.  (Tr. 393).  Plaintiff reported a history of frequent temper loss if something does not go as planned or expected, if something is not as simple as expected.  (Tr. 393).  Plaintiff also reported a history of aggression which included verbal threats made out of anger, yelling, swearing, and arguing.  (Tr. 393). Upon evaluation Ms. Andreason observed that Plaintiff's mood was depressed and anxious.  (Tr. 394).  Plaintiff reported that he was obsessed with cleanliness and wanting things to be done by others.  (Tr. 394).  Ms. Andreason

opined that Plaintiff had good judgement and insight, that his memory remained intact, and his eye contact good.  Ms. Andreason also observed that Plaintiff's concentration was fair, he was fidgety, and restless, and his motivation to change and his level of cooperation was "fair."  (Tr. 394).

On March 28, 2012, Plaintiff reported that because he is always anxious, he does not have much social activity.  (Tr. 395).  Dr. Shapiro observed that Plaintiff appeared tense and spoke very rapidly but intelligently.  (Tr. 395).  Dr. Shapiro observed that "[a]t times it is hard to get a word in."  (Tr. 395).  Plaintiff reported that his father does not listen and talking to his father is like talking to a rock.  (Tr. 395).  Plaintiff stated that he calls his mother about five times a week and they speak for about twenty minutes.  (Tr. 395).  Dr. Shapiro assessed Plaintiff with a GAF score of 50.  (Tr. 395).

On April 25, 2012, Dr. Shapiro noted that Plaintiff was "exceptionally circumstantial."  (Tr. 397).  Plaintiff reported his mood as a 5 on a scale where 10 indicates a good mood.  (Tr. 397).  Plaintiff denied any current hallucinations but reported that he would have some light auditory hallucinations if he is in severe stress.  (Tr. 397).  Plaintiff reported that stressors included if someone shouts, the phone rings, or if someone walks in.  (Tr. 397).  Plaintiff reported that when he gets wound up and aggravated with people he will say, "Why can't you just shut your mouth" and sometimes he might try to get someone fired, which Dr. Shapiro

stated is what he interprets as what Plaintiff means when he says that he can be "outspoken." (Tr. 397). Plaintiff indicated that he wanted to try Abilify and Dr. Shapiro wrote a prescription for Abilify. (Tr. 397).

On May 16, 2012, Dr. Shapiro noted that Plaintiff had a slight tremor in the right hand. (Tr. 397). Dr. Shapiro assessed Plaintiff with a GAF score of 50 and noted "I don't think I'll be seeing him again and he'll make an appointment for next month." (Tr. 398). On June 8, 2012, Ms. Allis noted that Plaintiff's anxiety was increasing and it was becoming more difficult to deal with small things and people in general. (Tr. 399). Ms. Allis noted that Plaintiff's bipolar was cycling more rapidly and assessed Plaintiff with a GAF score of 53. (Tr. 399-400). On June 14, 2012, Plaintiff reported that his anxiety was up and that he might need more lithium. (Tr. 401). Ms. Fairchild-Pitcher observed that Plaintiff made fair eye contact, blinked rapidly and frequently, his speech was slightly pressured but regular in tone, with a neutral mood, and mildly restricted and anxious affect. (Tr. 401).

On July 26, 2012, Ms. Fairchild-Pitcher observed that Plaintiff had an anxious affect, blinked excessively but made good eye contact, was engaged and interested in the conversation, polite, and with speech that was slightly rapid but non-pressured. (Tr. 402). Ms. Fairchild-Pitcher noted that Plaintiff's thoughts were relevant "but ruminative and he catastrophizes." (Tr. 402).

On August 23, 2012, Plaintiff reported improvement after being on the Geodon for a few weeks but currently felt that he was ruminating more with higher anxiety. (Tr. 439). Ms. Fairchild-Pitcher observed that Plaintiff was pleasant and cooperative and that he made "intense eye contact and blink[ed] frequently." (Tr. 439). Ms. Fairchild-Pitcher noted that Plaintiff's speech was rapid but regular in tone, his thoughts were logical but ruminative, and his mood remained dysphoric and anxious. (Tr. 439). Ms. Fairchild-Pitcher stated that Plaintiff "constantly catastrophizes and speculates about poor outcomes of real or hypothetical situations," "verbalizes a pervasive distrust of others and is consumed with thoughts of others trying to deceive or mistreat him," and "is constantly preoccupied with unjustified doubts about the trustworthiness or abilities of others." (Tr. 439). Ms. Fairchild-Pitcher opined that Plaintiff "misreads others and often feels people are laughing at him or talking about him," and that he "also show symptoms of obsessive compulsive personality disorder and dependent personality traits." (Tr. 439). Ms. Fairchild-Pitcher opined that "therapy as well as psychopharmacologic interventions should be aimed at not only mood stabilization, but perhaps more importantly, his faulty thought process." (Tr. 439). Ms. Fairchild-Pitcher noted that Plaintiff "can often be very pleasant when he feels he is dealing with someone of authority and who he perceives as competent," and he also frequently verbalizes "insight into his behaviors and thought patterns which

is a significant asset." (Tr. 439). Ms. Fairchild-Pitcher assessed Plaintiff with a GAF score of 55. (Tr. 439). On September 27, 2012, Ms. Fairchild-Pitcher noted that Plaintiff "makes intense eye contact and blinks frequently." (Tr. 440). Ms. Fairchild-Pitcher noted that Plaintiff's mood remained dysphoric and anxious and assessed Plaintiff with a GAF score of 55. (Tr. 440).

On December 13, 2012, Plaintiff stated that he needed his medications. (Tr. 442). It is noted that Plaintiff had "a long history of paranoia as well as pervasive anxiety." (Tr. 442). Dr. Babbar noted that Plaintiff started seeing Dr. Shapiro and was transferred to Ms. Fairchild-Pitcher and after she left, Plaintiff was transferred to his care. (Tr. 442). Plaintiff reported being extremely anxious about switching providers and had a lot of anticipatory anxiety about this initial meeting with Dr. Babbar. (Tr. 442). In relating history of his illness Plaintiff reported that he goes on buying sprees, has problems thinking and his symptoms could last from a week to two weeks. (Tr. 442). Dr. Babbar noted that during the depressive periods Plaintiff gets irritable and has persecutory ideations. (Tr. 442). Plaintiff said that his anxiety persists but part of that is to do with change in providers. (Tr. 442). Dr. Babbar noted that Plaintiff has been on a "number of medications" including Luvox, lithium, Haldol, Klonopin, Seroquel, and Abilify. (Tr. 442). Plaintiff reported that he had been reading more about electrical things and cars and that he spends a lot of time working on family's cars. (Tr. 442). Upon examination Dr.

Babbar observed that Plaintiff had a normal rate and volume of speech, anxious mood, circumstantial thought process but was able to be redirected.  (Tr. 443). Plaintiff gave a history "suggestive of intermittent nonspecific persecutory ideation and his insight and judgment were fair.  (Tr. 443).

Dr. Babbar opined that although he has been diagnosed with bipolar disorder, Plaintiff's given history did not suggest discrete manic or hyper-manic episodes and thus he will diagnose him with bipolar disorder not otherwise specified.   (Tr. 443).   Dr. Babbar also opined that Plaintiff gave a history suggestive of a possible autistic spectrum disorder and that his psychotic symptoms appear to be worse during depressive phases.  (Tr. 443).  Dr. Babbar assessed Plaintiff with a GAF score of 58.  (Tr. 443).  Dr. Babbar noted that Plaintiff had been assigned to a therapist but had not been attending and Dr. Babbar "[s]trongly encouraged" Plaintiff to consider individual therapy.  (Tr. 442).  Plaintiff was also agreeable to bring his mother with him at next visit in order to provide a collateral history. (Tr. 443).

On January 10, 2013, after discussing the effects of Plaintiff's medications Dr. Babbar adjusted Plaintiff's prescriptions.  (Tr. 445).    Dr. Babbar noted that Plaintiff was doing slightly better, he has decreased the number of calls and his therapist corroborated the improvement.  (Tr. 445).  Plaintiff reported that his mood had been variable and gets into some conflicts with his father but overall

doing fine. (Tr. 445). Dr. Babbar noted that Plaintiff's speech was normal in rate, tone, and volume, his mood had improved slightly, and his affect was constricted. (Tr. 445). Dr. Babbar noted that Plaintiff's thought process was linear and his insight and judgment were fair. (Tr. 445).

On February 18, 2013, Plaintiff reported that he has been doing fine overall, however, he stated that he gets irritable at times and cited an example that he got very irritable with a customer service agent. (Tr. 447). Plaintiff reported that his mood had been stable and that he experiences a lot of anticipatory anxiety when he has to meet people and he was very anxious about coming to the appointment that day since he had missed a couple of appointments. (Tr. 447). Dr. Babbar observed that  Plaintiff was cooperative, his speech was normal in rate, tone, and volume, and his affect was constricted but fairly appropriate. (Tr. 447). Dr. Babbar noted that Plaintiff's mood had been variable and his insight and judgment were fair. (Tr. 447).

On March 25, 2013, Dr. Babbar noted that it was "very encouraging to note that he called the crisis line just twice in the last one week." (Tr. 449). Plaintiff reported that his mood was more stable and he has worked out with his therapist to get therapy two hours a week. (Tr. 449). Dr. Babbar noted that Plaintiff's mood had been relatively stable and speech normal. (Tr. 449). Dr. Babbar noted that Plaintiff's affect was constricted, but that this was the baseline for him. (Tr. 449).

Dr. Babbar stated that he would see Plaintiff in a couple of months or earlier if necessary. (Tr. 449).

On May 30, 2013, Plaintiff reported that he has been feeling slightly more anxious and there was some problem with his insurance. (Tr. 551). It is noted that Plaintiff "has not filled out the required paperwork and that will relapse in a few days" and is working on getting reinstated. (Tr. 551). Plaintiff reported easy irritability and insomnia. (Tr. 551). Dr. Babbar added trazodone to the medication regimen to see if that would help with sleep. (Tr. 451).

On August 22, 2013, Dr. Babbar noted that Plaintiff seems to be at baseline and "continues to call crisis line 2-3 times a week." (Tr. 453). Plaintiff reported that there are times when he can go for weeks without calling and then he starts feeling anxious and needs to call back again. (Tr. 453). However, Dr. Babbar noted that his reported situational stressors did not seem to be in excess of the usual. (Tr. 453). Plaintiff continued to perseverate on medication issues "but overall no major problems." (Tr. 453).

On September 17, 2013, Plaintiff was discharged from outpatient therapy due to his refusal to participate. (Tr. 436). Plaintiff's listed problems included: anxiety; dealing with people; the precarious nature of conversations; temper/anger management; utilizing coping skills when experiencing anxiety/social relations; and, trust issues. (Tr. 436). Ms. Mullen assessed Plaintiff with a GAF score of 53

and opined his prognosis was poor.  (Tr. 436-437).  Ms. Mullen explained that

Plaintiff is refusing outpatient therapy despite recommendations.  (Tr. 437).

In a letter dated October 07, 2013, Dr. Babbar wrote:

> I have been seeing [Plaintiff] since December of 2012. [Plaintiff] has
> a diagnosis of Bipolar Disorder NOS. He has a long-standing history
> of mood instability, anxious ruminations and difficulty in adjusting to
> new situations. His symptoms have been long-standing in nature and
> poorly responsive to medications.

(Tr. 457).  In a letter dated December 23, 2013, Ms. Kipp wrote:

> CONCERN provides Walk-in, Mobile and Telephone Crisis
> Intervention services . . . 24 hours/day, 7days a week. [Plaintiff]
> typically utilizes [our] Telephone Crisis services.
>
> [Plaintiff] has used our Walk in Crisis services on occasion but this is
> not very often. . . . [O]n average [Plaintiff] uses our Telephone Crisis
> service four times a week, this number does fluctuate from week to
> week. . . .
>
> [Plaintiff] is diagnosed with Bipolar Disorder. [Plaintiff] struggles
> with frequent anxiety and stress. He often uses the crisis line to seek
> someone to assist him in relieving himself from some of his stress and
> anxiety.  [Plaintiff] has to be reminded to utilize coping skills and
> often be told what skills to utilize. [Plaintiff] also has difficulties with
> paranoia and at times needs assistance recounting an event that just
> occurred in public as he feels that people were singling him out for
> some reason or somehow he may have caused a problem where he
> may have just been.
>
> [Plaintiff] also goes through times of severe depression. During these times
> [Plaintiff] reports struggles with getting out of bed and going about his daily
> routine. [Plaintiff] will utilize crisis at these times to assist him in working
> through the depression and to assist him in trying to find the motivation,
> support and encouragement to get out of bed and do something for the day.
> A majority of [Plaintiff's] crisis calls are related to anxiety, stress or
> depressive symptoms.

(Tr. 584).

### 3.  Northern Tier Counseling: Teresa Hennessy; Rose Rudloff, R.N.-C; Michael Lavin, Psy.D.; Dr. McGurk; Geri DePaola, R.N.-C; Korie Lambert, P.A.-C; Teresa Pitcher

In a phone call report dated January 6, 2006, Ms. Hennessy wrote that Plaintiff was calling on a daily basis demanding to speak with the nurse and refusing to leave messages. (Tr. 459). Plaintiff demanded to have staff interrupt a session to speak with him and recently called and used profanity toward secretary and spoke with Mr. Douglas. (Tr. 459). Ms. Fairchild-Pitcher called Plaintiff and he complained of severe left arm pain (Ms. Hennessy indicated that she was unsure if he injured himself) and wanted to know if arm pain is related to the Abilify. (Tr. 459). Ms. Fairchild-Pitcher encouraged Plaintiff to have is left arm pain evaluated by a medical doctor and Plaintiff was agreeable. (Tr. 459). Ms. Hennessy wrote that she clearly explained to Plaintiff the importance of specifying his needs and to treat staff with respect and Plaintiff expressed understanding. (Tr. 459).

In another phone call report dated January 6, 2006, when Plaintiff was told that another staff person was busy, he yelled ''this is how it always is here.'' (Tr. 460). As Ms. Lambert tried to explain how his problem would be resolved later, Plaintiff became angrier, refused to leave a number and said he may have to just not come here anymore. (Tr. 460). Plaintiff was informed that was his choice, but they could help him if he would allow them to call him back. (Tr. 460). Plaintiff

responded not to call, "no one wants to help me."  (Tr. 460). It was noted that Plaintiff has been calling and harassing at various offices and that if he calls again he should only talk to Alan Douglas.  (Tr. 460).

In a phone call report dated January 7, 2006, Plaintiff stated that anxiety had always been a problem however, "now I'm more nervous," "over anxious."  Ms. Rudloff noted that Plaintiff "started verbal aggression/agitation directed at on call crisis worker" and Ms. Rudloff informed him of the policy regarding accessing nurses on call and client accepted the explanation.  (Tr. 461). Plaintiff reported increased anxiety "more than usual" and taking recommended dose of Abilify. (Tr. 461).  Ms. Rudloff noted that Plaintiff reported "attempting to behaviorally manage anxiety i.e. exercising, limiting caffeine" without any improvement of symptoms.  (Tr. 461).  Plaintiff "clearly states he does not want any change to medication regimen at this time." (Tr. 461).

In a report dated January 13, 2006, Plaintiff stated that his Abilify was discontinued due to restlessness.  (Tr. 462).  Ms. Hennessy noted that Plaintiff appeared increasingly anxious and agitated and Plaintiff noticed that he decompensated with Abilify.  (Tr. 462). Ms. Hennessy stated that increased eye blinking was evident." (Tr. 462).  Ms. Hennessy also observed intense eye contact, facial tics, and that Plaintiff's thought disorganization evident.  (Tr. 462).  It was recommended to adjust his medication.  (Tr. 462).

In a phone call report dated January 16, 2006, Ms. Hennessy noted that she spoke with Dr. McGurk (in Dr. Lavin's absence) regarding Plaintiff's restlessness from Abilify and Dr. McGurk recommended to discontinue Abilify and start Geodon. (Tr. 463). However, when Ms. Hennessy spoke to Plaintiff about Dr. McGurk's recommendations, Plaintiff refused to try Geodon, insisted that he has less side effects with a lower dosage of Abilify and was "very determined to convince staff that he would benefit from Cogentin." (Tr. 463).

In a phone report dated January 17, 2006, Plaintiff called to discuss medication regimen, and reported that with the increased Abilify he is still experiencing internal restlessness and vented anger. (Tr. 464). Plaintiff still does not want Geodon, wants to remain on Abilify and would like Cogentin. (Tr. 464). Ms. Hennessy noted that Plaintiff remained "pressured with mild-mood agitation" and was reassured that his case will be discussed with Dr. Lavin on his return. (Tr. 464).

In a report dated January 27, 2006, Ms. Hennessy observed that Plaintiff remained pressured and expansive. (Tr. 465). Plaintiff reported that his mood was still cycling severely. (Tr. 465). Plaintiff reported that he hasn't been sleeping very well and has a poor appetite until late in the day. (Tr. 465). Plaintiff reported being distracted and "vocal." Ms. Hennessy observed that Plaintiff had very

pressured speech with an anxious and controlled affect, and intense eye contact. (Tr. 465).

In a report dated February 14, 2006, Plaintiff reported that he had not been able to find work and he planned to speak with a psychiatrist about temporary disability. (Tr. 466).  Plaintiff reported that it was difficult for him to fall asleep. (Tr. 466).  Dr. Lavin observed that Plaintiff was blinking more and noted Plaintiff feels that it is due to anxiety.  (Tr. 466).  Dr. Lavin adjusted his medication.  (Tr. 466).

On February 25, 2006, Plaintiff reported GI side-effects from a medication change.  (Tr. 467).  In a report dated March 7, 2006, Dr. Lavin observed that Plaintiff remained pressured with a controlled affect and "highly anxious" mood. (Tr. 468).  Plaintiff reported stress related to events, overwhelmed with multi-tasking, bipolar symptoms and stressed that his therapist would be away of maternity leave.  (Tr. 468).  Dr. Lavin observed that Plaintiff appeared somewhat irrational when attempting to explain, "I need to do something strenuously."  (Tr. 468).  Plaintiff reported feeling hopelessness and his sleep pattern was excessive. (Tr. 468).  Plaintiff reported that he turned down a job offer and may reconsider that decision. (Tr. 468).  Dr. Lavin indicated that his progress in relation to his goals was worse.  (Tr. 468).

On April 11, 2006, Plaintiff reported still continuing to look for a job and was adjusting to new therapist and assessed as stable. (Tr. 470). It was recommended that his medications be adjusted. (Tr. 470). In a phone call report dated May 4, 2006, Plaintiff reported that he missed taking his morning medication and "just realized it now" at 6:45 in the evening. (Tr. 471). Plaintiff acknowledged that he was a frequent caller to crisis phone number and said that he was "working on this but you don't know how bad off I am." (Tr. 471). Plaintiff described feeling edgy, anxious and not sure what to do regarding his missed dosage and was instructed not to "catch up" on missed medication but that he may take his medication currently rather than waiting for 9:00 in the evening. (Tr. 471).

On May 25, 2006, Plaintiff came to session ten minutes late with his father and had not taken his morning dosage of medication due to "being rushed." (Tr. 472). Plaintiff's father described Plaintiff as "contentious" and that Plaintiff continued to "fly off the handle over little things." (Tr. 472). Ms. DePaola and Dr. Lavin observed that Plaintiff's mood remained variable, that he "readily escalate[d] to verbal aggression at times," and that this verbal escalation was adversely impacting interactions with family, peers, in addition to interactions with possible employers as he was actively seeking employment. (Tr. 472). It was noted that Plaintiff's sleep remained variable, speech was pressured and rapid, though goal-oriented. (Tr. 472). On June 13, 2006, Plaintiff called to report that Klonopin was

not working and that his anxiety has increased due to schedule change.  (Tr. 473).

On July 12, 2006, Plaintiff stated that "some days just feels like lying in bed."  (Tr.

474).

In a phone report dated August 4, 2006, it was noted that Plaintiff calls

multiple times this week, refusing to leave messages.   (Tr. 476).   When Ms.

Lambert. I finally spoke with Plaintiff, he reported that he was worried about his

bloodwork, wondering why Dr. Lavin had not returned his call and reported being

"depressed, lethargic, does not want to get out of bed in the morning."  (Tr. 476).

Plaintiff requested something to help improve his mood. (Tr. 476).

In a phone call report dated August 15, 2006, Plaintiff stated that he didn't

think the medication was working and that he was having trouble and experiencing

poor energy, depression and anxiety.  (Tr. 477).  Plaintiff admitted that he had

made a lot of progress in therapy and that his temper is not as bad as it used to be.

(Tr. 477).  In a report dated August 18, 2006, Plaintiff reported that he continued to

have no energy, felt depressed, his anxiety level was very high, and his obsessional

thoughts had increased recently.   (Tr. 478).   Plaintiff reported being very obsessed

about treatment and only has one more therapy session with Katy.  (Tr. 478).  Dr.

Lavin observed Plaintiff having facial tics present, stable mood, minimal

irritability, pressured speech, and his thoughts were organized.  (Tr. 478).   On

August 22, 2006, Plaintiff called to report that his drowsiness had increased with

the dosage increase and that his anxiety level increased regarding his dosage increase.  (Tr. 479).

On September 7, 2006, Plaintiff called to report his dosage was too high and that he wanted something else.  (Tr. 480).  It was noted that Plaintiff's speech was pressured, argumentative, and resistant to recommendations.  (Tr. 480).  Plaintiff stated "If you want to get rid of me, fine."  (Tr. 480).  It was noted that Plaintiff exhibited increased irritability, agitation, and paranoid ideation during contact.  (Tr. 480).  On October 6, 2006, Plaintiff reported he was "in a highly depressed state."  (Tr. 481).  Dr. Lavin assessed Plaintiff with a GAF score of 50 and adjusted his medication.  (Tr. 481).  Plaintiff reported being very anxious about his struggle with finding a job.  (Tr. 481).  Plaintiff reported a continued low motivation and low energy.  (Tr. 481).

On October 25, 2006, Dr. Lavin assessed Plaintiff with a GAF score of 55.  (Tr. 482).  Plaintiff reported remaining in bed until one in the afternoon for five days the last week, but that this week his sleep was more erratic.  (Tr. 482).  Plaintiff reported increased angry outbursts and greater frustration overall.  (Tr. 482).  Plaintiff exhibited verbal outburst in the waiting room which was addressed in session with alternative responses/behaviors explored in session.  (Tr. 482).  Dr. Lavin noted that Plaintiff's anxiety level was more prominent and impairing

activities and that he was more easily distracted during the visit.  (Tr. 482).  Dr. Lavin adjusted Plaintiff's medication.  (Tr. 482).

A phone call report dated November 15, 2006, noted that Plaintiff left a message requesting for Nicole refer to the previous crisis notes since he was still having similar problems.  (Tr. 484).   Plaintiff reported feeling more stressed and overwhelmed by recent attempts to pursue employment.   (Tr. 484).   Plaintiff discussed experiencing increased anxiety and increased frustration with the job application procedures.  (Tr. 484).  Plaintiff stated that he finds himself "talking on and on about nothing; getting funny looks from everyone."  (Tr. 484).  Ms. Rudloff observed that Plaintiff's speech was organized though pressured and rambling.  Although "[t]emper" was still a problem, Plaintiff reported that taking a "time out" and separating himself from the situation for a short term allowed him to "regroup."  (Tr. 484)

In a report dated December 19, 2006, Dr. Lavin noted increased blinking and Plaintiff reported that he cut his lithium dosage in half on his own.  (Tr. 486).  Dr. Lavin assessed Plaintiff with a GAF score of 50.  (Tr. 486). Dr. Lavin noted that Plaintiff was alert and oriented times three, cooperative, but speech rapid and pressured.  (Tr. 486).  Dr. Lavin noted that Plaintiff was more irritated and reported being "jumpy."  (Tr. 486).  Dr. Lavin observed that Plaintiff was able to accept redirection and was able to refocus; however, it was "short lasting."  (Tr. 486).

Although Dr. Lavin recommended an increase in Buspar dosage, Plaintiff declined the medication change.  (Tr. 486).

In a phone call report dated December 21, 2006, it was noted that Plaintiff was nervous and overreacting during the call.  (Tr. 487).  In response to the two medication options, Plaintiff "scream[ed] "I'm tired of this run around."  (Tr. 487).  In a report dated January 3, 2007, signed by Ms. Lambert and Dr. Lavin, Ms. Lambert noted that Plaintiff is currently in orientation for a new job and his anxiety level had been very high.  (Tr. 490).  Plaintiff reported that he had not had any explosive outbursts in over a month and he has been doing therapy once a month. (Tr. 480).  Ms. Lambert observed that Plaintiff was alert and oriented times three, was receptive to advice, displayed no irritability and his speech was appropriate. (Tr. 490).  Ms. Lambert assessed Plaintiff with a GAF if 55.  Dr. Lavin again discussed increasing Buspar and Plaintiff refused and wanted a second opinion and Ms. Lambert noted that she would discuss the matter with Dr. Lavin.  (Tr. 490).

In a report dated January 4, 2007, Dr. Lavin noted that Plaintiff made progress in increasing his coping skills and no progress in identifying triggers that increase anxiety involved in looking for work and to decrease "self-sabotaging efforts when close to obtaining employment."  (Tr. 489).  Dr. Lavin assessed Plaintiff with a GAF score of 55.  (Tr. 489).  In a phone call report dated February 23, 2007, it was noted that Plaintiff called regarding an update from Ms. Lambert

regarding the Buspar increase and he was told that Dr. Lavin agreed with the recommendation and that Plaintiff should proceed with the increase dosage until the next visit. (Tr. 491). Plaintiff reported remaining anxious and experiencing a high level stress due to his father threatening to "throw [him] out." (Tr. 491). Plaintiff's medications were adjusted. (Tr. 491).

In a medical record dated March 12, 2007, Plaintiff reported that he worked for a month and quit because he was being rushed. (Tr. 492). Dr. Lavin adjusted Plaintiff's medications. (Tr. 492). In a record dated March 23, 2007, signed by Ms. Rudloff and Dr. Lavin, Plaintiff reported experiencing lots of stress with searching and interviewing for job. (Tr. 493). Plaintiff reported not consistently taking Buspar as recommended and he is reluctant to take an increased dose because he attributes it with his recent increase in sleep disturbance, insomnia, racing thoughts, and irritability. (Tr. 493). Ms. Rudloff observed excessive blinking, rapid mildly pressured speech, reassurance seeking, and "no [increase] disorganization, evidence of psychosis is present." (Tr. 493). Ms. Rudloff assessed Plaintiff with a GAF if 55. (Tr. 493). Plaintiff stated that he was willing to increase dosage of Buspar. (Tr. 493).

In a record signed by Dr. Lavin and Ms. Rudloff dated March 30, 2007, Plaintiff reported not taking medications for the past three days. (Tr. 494). Plaintiff reported vomiting and diarrhea which since it started resolving, Plaintiff

had resumed his medications as prescribed except for Buspar.  (Tr. 494).  Ms. Rudloff assessed Plaintiff with a GAF score of 55 and observed that Plaintiff remained overly anxious with mildly pressured speech.  (Tr. 494).  Plaintiff reported an increased sense of stress as he anticipated beginning employment on Monday. (Tr. 494).  Plaintiff reported that his appetite remains unchanged and he still eats one meal a day, and reported that he continues to have success managing his "temper outbursts."  (Tr. 494).  In a record dated May 7, 2007, Plaintiff reported having conflict with his father, had been anxious and sleeping three to four hours some nights.  (Tr. 495).

On May 25, 2007, Plaintiff's Trazadone medication was increased. (Tr. 497).  On June 1, 2007, Plaintiff reported experiencing significant stress at home and his attempts to find employment causes more anxiety.  (Tr. 498).  Plaintiff increased the dosage of Trazadone on his own from 50 mg to 75 mg and requests a higher dosage.  (Tr. 498).  It was noted that he could continue at 75 mg of Trazadone and that he could increase to 100 mg if needed.  (Tr. 498).

On June 19, 2007, Plaintiff reported that he experienced "extreme" mood variability and at the time of the incident he doubled the dose of lithium and "came down" within a couple of hours.  (Tr. 500).  Ms. Rudloff noted that Plaintiff's speech was mildly rapid and pressured.  (Tr. 500).  On June 22, 2007, Plaintiff reported experiencing G.I. problems and Ms. Pitcher noted that Plaintiff appeared

agitated explaining that he was late for a job fair that started over an hour ago.  (Tr. 501).  Ms. Pitcher discussed the possibility that the G.I. symptoms were anxiety related.  (Tr. 501).  On June 27, 2007, Plaintiff calls to inquire if his G.I. symptoms were due to lithium toxicity and reported that he had been off of the lithium for a while.  (Tr. 502).  Plaintiff also reported increased anxiety over finding a job. (Tr. 502).

On July 20, 2007, Plaintiff reported that he continued to seek employment without success, that when he is "running high" he stays awake all night and he remains anxious.  (Tr. 503).  He was assessed with a GAF score of 55 and his medication regimen was continued.  (Tr. 503).  On July 27, 2007, Plaintiff reported helping with household chores and that he needed to use 100 mg of Trazadone five nights a week.  Plaintiff's speech was not rapid or pressured and he showed no evidence of agitation.  (Tr. 504).  Plaintiff complained about his medication and his Buspar dosage was increased.  (Tr. 504).  He was assessed with a GAF score of 50. (Tr. 504).

On August 9, 2007, Plaintiff reported that he had a job interview that day. (Tr. 505).  On August 21, 2007, Plaintiff reported that he started working second shift doing "line assembly with board electronics" with nine individuals on line. (Tr. 506).  So far he reported getting along well with his peers and that sometimes they test him to see what he would do.  (Tr. 506).  The line supervisor said that he

talked too much.  (Tr. 506).  Ms. Rudloff observed excessive blinking in addition to rapid and pressured speech.  (Tr. 506).  Ms. Rudloff noted that Plaintiff exhibited "mild underlying paranoid ideation centering around peers, supervisor's action [and] verbalizations."  (Tr. 506).  Ms. Rudloff noted that Plaintiff remained easily frustrated which culminates in verbal aggression and agitation at times.  (Tr. 506).  Plaintiff requested a trial of Depakote because it worked well in the past by slowing him down.  (Tr. 506).  It was also noted to consider discontinuing Cogentin for the next appointment.  (Tr. 506).

On September 26, 2007, Plaintiff was assessed with a GAF score of 51 and deemed "stable."  (Tr. 508).  It was noted that Plaintiff: 1) made progress with coping skills, but not always able to use them effectively; 2) made limited progress in identifying feelings, anxiety triggers, and self-sabotage; and, 3) no progress with increased family cohesion.  (Tr. 508).  Stated goals included to stabilize Plaintiff's medication regimen, and decrease the number of calls and counseling appointments.  (Tr. 508).

On October 11, 2007, Plaintiff reported that he is still seeking employment that is electrical in nature and that he recently received notice of being declined for employment recently.  (Tr. 511).  Plaintiff reported that although some anxiety persisted, it was not as severe as it has been, and his sleep has been inconsistent.  (Tr. 511).  Ms. Rudloff noted that Plaintiff's speech was tangential with some

suspiciousness.  (Tr. 511).  Ms. Rudloff assessed Plaintiff with a GAF score of 55. (Tr. 511). Plaintiff indicated that he wanted to wait until his next appointment in two weeks before increasing Depakote to 750 mg.  (Tr. 511).  On October 25, 2007, Plaintiff reported "having trouble sleeping again" and remains frustrated with the process of seeking employment and views that he is too anxious at interviews and this "sabotages" his employment opportunities.  (Tr. 512).  Ms. Rudloff observed that Plaintiff's speech was rapid, pressured, and tangential, that his anxiety level remains elevated and his thoughts remain rapid, but still organized.  (Tr. 512).  Ms. Rudloff assessed Plaintiff with a GAF score of 55.  (Tr. 512).  His medications were adjusted to increase the dosage of Depakote and Buspar.  (Tr. 512).

On November 1, 2007, Plaintiff reported frequent missed doses of his medication.  (Tr. 513).  Plaintiff said that if his mother brings any documents with his signature on them, he did not sign them for her.  (Tr. 513).  Plaintiff expressed fear and paranoid ideation that his mother wanted his records or wanted to put bills in his name.  (Tr. 513).  He was encouraged to resume medication.  (Tr. 513).  On November 20, 2007, Plaintiff reported that he still wants to get a job but that he gets people upset and Dr. Lavin adjusted his medication.  (Tr. 514).

On November 29, 2007, Plaintiff reported that he was calmer but had some frustration with his inability to go to a job fair the day before and reported that he

has not followed through with the increased dosage of Buspar as recommended from the last visit. (Tr. 515). Ms. Rudloff noted overt anxiety with a blunted affect. (Tr. 515). Plaintiff reported that his aggression was better and a decrease in verbal outbursts. (Tr. 515). Medication was adjusted to increase Depakote to 1000 mg and Buspar to 30 mg. (Tr. 515).

On December 13, 2007, it was noted that Plaintiff's speech was rapid, tangential, and pressured. (Tr. 516). Plaintiff's mood remains variable, with poor frustration tolerance, and irritability, culminating at times in verbal aggression, energy remains. (Tr. 516). Plaintiff was assessed with a GAF score of 50. (Tr. 515). On December 20, 2007, it was noted that Plaintiff's underlying suspiciousness of other's actions persists and that he remained anxious regarding approaching holiday and family interactions. (Tr. 517). On December 27, 2007, Plaintiff reported that two acquaintances noticed that he has had a better temperament since starting Depakote. (Tr. 518). Ms. Rudloff noticed that Plaintiff was less tangential or pressured and that he had a better frustration tolerance with family. (Tr. 518). Ms. Rudloff assessed Plaintiff with a GAF score of 55. (Tr. 518).

On January 24, 2008, Plaintiff reported that he felt ''no balance" with things and that his therapists are "blowing out of proportion" matters regarding his father. (Tr. 520). On February 19, 2008, Plaintiff reported doing "okay" and more stable.

(Tr. 521). Plaintiff stated that he wanted to go back to school to be a medical lab technician and that he got a job and the new job makes him anxious.  (Tr. 521). On February 28, 2008, Plaintiff request samples of Abilify and were provided some. (Tr. 521).

On April 18, 2008, Plaintiff reported doing better interacting with people and no longer yelling as much and less "jumpy" in social settings.  (Tr. 522). Plaintiff reported that he improved with his insight regarding "misperceptions" of other people's actions being directed at him.  (Tr. 521).  Ms. Rudloff noted that the frequency of calls had diminished.  (Tr. 522).  Ms. Rudloff observed that Plaintiff was able to converse in a more relaxed fashion, however, his speech remained mildly pressured and tangential.  (Tr. 522).  Ms. Rudloff noted that Plaintiff's anxiety level was high at times, which lead to irritability.  (Tr. 522).  Ms. Rudloff assessed Plaintiff with a GAF score or 56.  (Tr. 521).  Plaintiff's medications were adjusted to increase the dosage of Buspar.  (Tr. 522).

On June 8, 2008, Plaintiff reported working 32 hours per week. (Tr. 524). On July 17, 2008, Plaintiff reported that he still worked and continued to adjust to working from 11 to 7.  (Tr. 525).  Plaintiff reported that things were going better with his father and that he had a disagreement with manager at work who told him to keep his mouth shut.  (Tr. 525).  Ms. Rudloff observed that Plaintiff was calm and his thoughts were organized, logical, and coherent.  (Tr. 525).   Plaintiff

declined the suggestion of increasing dosage of Buspar to reduce anxiety. (Tr. 525).

On August 29, 2008, Plaintiff reported increased anxiety related to an interaction with new coworker who does the audit. (Tr. 526). Plaintiff stated that he was extremely frustrated and felt that people at work were ''pushing [his] buttons.'' (Tr. 526). Ms. Rudloff noted that Plaintiff missed a therapy session earlier this week because he was too exhausted. (Tr. 526). Ms. Rudloff noted that Plaintiff's speech was rapid and pressure. (Tr. 526). Ms. Rudloff also noted that Plaintiff's anxiety was elevated and they role played to work on interactions at work. (Tr. 526). On September 9, 2008, Plaintiff was assessed with a GAF score of 58 and had made progress increasing his coping skills, stabilizing his medicine regimen, and decreasing the frequency of counseling. (Tr. 527).

On September 11, 2008, Plaintiff reported that his life is "normal" and is still working night shift three days a week. (Tr. 528). Dr. Lavin assessed Plaintiff with a GAF score of 54 and continued his medication regimen without any adjustments. (Tr. 528). On October 16, 2008, Plaintiff reported continued frustration with work, that he does not like management, does not agree with them, and feels "burned out." (Tr. 529). Ms. Rudloff observed that Plaintiff's mood appeared stable despite perception that he was targeted by coworkers and that his ''boss plays games.'' (Tr. 529). Plaintiff reported that his energy level varied with his mood

and that he was still looking for another job. (Tr. 529). Ms. Rudloff observed excessive blinking and pressured speech; however, his thoughts were still organized. (Tr. 529). Plaintiff proceeded with an increase in Buspar dosage and noticed a benefit. (Tr. 529). Ms. Rudloff assessed Plaintiff with a GAF score of 54. (Tr. 529).

On November 26, 2008, Plaintiff reported feeling burned out from work, his employer reduced work hours to zero, was disciplined for an isolated incident where he fell asleep on duty and he filed for unemployment. (Tr. 530). Ms. Rudloff observed that Plaintiff's speech was mildly pressured but logical and Plaintiff reported that he was not as "pushy" in his social interactions. (Tr. 530). Ms. Rudloff assessed Plaintiff with a GAF score of 55. (Tr. 530). On December 18, 2008, Plaintiff reported that he was laid off from work and said that they hired other people. (Tr. 531). Plaintiff reported that there were "guest complaints" but they were unwilling to discuss it with him and he had been working there for six weeks. (Tr. 531). Dr. Lavin assessed Plaintiff with a GAF score of 55 and adjusted his medication. (Tr. 531).

On December 26, 2008, Plaintiff reported that the one of his medications was too sedating, however, recognized improvement with initial insomnia. (Tr. 532). Plaintiff reported that he has done better with establishing a daily routine and although anxiety is still present, he is actively using stress reduction

techniques.  (Tr. 532).  Ms. Rudloff noted that Plaintiff's mood remained variable, had mildly pressured speech, and had underlying paranoid ideation.  (Tr. 532). Ms. Rudloff assessed Plaintiff with a GAF score of 55.  (Tr. 532).  Plaintiff's medication was adjusted.  (Tr. 532).  On January 16, 2009 medical, Plaintiff reported that he is sleeping more, has improved mood stability, but still continues to feel anxious throughout the day.  (Tr. 533).  Ms. Rudloff noted improvement in symptoms and recommended adjusting the timing of Plaintiff's medication.  (Tr. 533).

On January 21, 2009, Plaintiff reported feeling more stressed in recent weeks and requested to change his therapist and was directed to discuss the matter with his therapist.  (Tr. 354).  Plaintiff reported improvement as a result of the medication timing adjustment in that he was not as "uptight and intense."  (Tr. 534).  Ms. Rudloff noted that Plaintiff was cooperative, easily distracted, and with mildly pressured speech.  (Tr. 534).  Ms. Rudloff assessed Plaintiff with a GAF score of 55.  (Tr. 534).  In treatment plans dated February 10, 2009, and June 10, 2009, it was noted that Plaintiff had "anger outbursts and agitation" was anxious, and "not able to communicate with other people on a healthy basis at all times." (Tr. 535, 540).  On February 27, 2009, Plaintiff reported that he felt more depressed for over a month and could not get out of bed.  (Tr. 537).  Ms. Lambert assessed Plaintiff with a GAF score of 55.  (Tr. 537).

On March 23, 2009, Plaintiff reported feeling down and that he is fighting with an ex-employer who said he was sleeping on the job.  (Tr. 538). Dr. Lavin assessed Plaintiff with a GAF score of 55.  (Tr. 538).  On May 15, 2009, Plaintiff reported experiencing a lot of stress, continues to unsuccessfully seek employment, and that his mood is fluctuating.  (Tr. 539).  Ms. Rudloff noted that Plaintiff's mood was more down than usual and his speech was pressured and tangential.  (Tr. 539).  Ms. Rudloff assessed Plaintiff with a GAF score of 54 and his medication was adjusted.  (Tr. 539).

On June 12, 2009, Plaintiff reported that he has improved with his negotiation skills, continued to work on anger management, and his anxiety has improved.  (Tr. 542).  Plaintiff reported that he still felt paranoid in social settings, but it has improved.  (Tr. 542).  Ms. Rudloff noted that Plaintiff was less irritable and anxious.  (Tr. 542).  Ms. Rudloff assessed Plaintiff with a GAF score of 56 and his medications were continued without any adjustment.  (Tr. 542).  On July 22, 2009, Dr. Lavin assessed Plaintiff with a GAF score of 56.  (Tr. 543).

On August 21, 2009, Ms. Rudloff noted no acute change in status and assessed Plaintiff with a GAF score of 58 and his medication regimen remained the same.  (Tr. 544).  On September 21, 2009, Plaintiff reports that he is sleeping better, still seeking employment and is managing his anger better.  (Tr. 545).  Ms. Rudloff assessed Plaintiff with a GAF score of 62 and his medication regimen

remained the same.  (Tr. 545).  In a treatment plan dated October 15, 2009, it was noted that the medications were effective and Plaintiff was complying with the medication regimen.  (Tr. 546).  Plaintiff was assessed with a GAF score of 65. (Tr. 546).

On November 4, 2009, Plaintiff reported that he had been stressed and waiting to start his new job. Plaintiff reported that anger management had helped him. (Tr. 548).  Dr. Lavin continued Plaintiff on his medication without any changes.  (Tr. 548).  In phone call records dated November 13, 2009, and November 25, 2009, Plaintiff reported having diarrhea for months and said it was worse with the increase of Depakote.  (Tr. 549-50).  On December 22, 2009, Plaintiff reported that he was "getting outburst" and was "under a lot of pressure with all of the insurance stuff" and trying to find work.  (Tr. 551).  Plaintiff appeared anxious, with rapid speech, and appropriate affect.  (Tr. 551).  Plaintiff reported increased anxiety regarding an insurance switch and the possibility of having to see another provider.  (Tr. 551).  Plaintiff was assessed with a GAF score of 62.  (Tr. 551).  In a phone report dated January 18, 2010, Plaintiff requested a week supply of medication until he starts seeing his new doctor on January 22, 2010.  (Tr. 552).

In a discharge plan dated February 11, 2010, it was noted that he was treated since May 23, 2005, and he was county funded until recently when he was notified

that he was losing funding.  (Tr. 553).  He was assessed with a GAF score of 63 with a "poor" prognosis.  (Tr. 553)

On March 12, 2013, Plaintiff sought to restart treatment and complained that his treatment at CONCERN was ineffective.  (Tr. 588).  Plaintiff stated that he was "high maintenance" and that he doesn't get along with staff.  (Tr. 588).  Plaintiff said "My needs aren't being met" "I'm turning them into CCBHO."  (Tr. 588).  It was noted that he was easily distracted, affect shifted from expansive to blunted, was anxious and turned irritable and inpatient.  (Tr. 588).  It was noted that he was constantly blinking.  (Tr. 588).  It was noted that he had poor judgement and insight with a tangential thought process.  (Tr. 588).  It was noted that his speech was pressured and his impulse control was poor.  (Tr. 589).

In a discharge plan dated May 12, 2013, it was noted that Plaintiff reported being dissatisfied with the treatment provided by CONCERN and did not return for recommended treatment after initial intake and reportedly called in April 2013 stating that he was returning to CONCERN.  (Tr. 586).  Plaintiff was assessed with a GAF score of 52.  (Tr. 586).

### 4.    Psychiatric Review Technique: John N. Grutkowski

On August 22, 2012, Dr. Grutkowski provided an opinion based upon review of evidence from the Guthrie Clinic, Plaintiff's self-report of functions,

Plaintiff's work history, and CONCERN records as of August 16, 2012. (Tr. 72).

Dr. Grutkowski cited a record dated July 26, 2012, summarizing Ms. Fairchild-

Pitcher's observations.   (Tr. 402).    Significantly, it does not appear that Dr.

Grutkowski reviewed the lengthy records from Northern Tier Counseling or Tioga

Counseling Center during the relevant time period.  (Tr. 71-72).  Dr. Grutkowski

indicated that the Psychiatric Review Technique was for the period leading up to

Plaintiff's date of last insured of December 31, 2011. (Tr. 72, 75).  Dr. Grutkowski

opined that Plaintiff's medically determinable impairment did not satisfy the

criteria for Listings 12.04 or 12.06.  (Tr. 72).  Dr. Grutkowski further opined that

Plaintiff had mild restrictions in ADLs, mild difficulties in maintaining social

functioning, moderate difficulties in maintaining concentration, persistence or

pace, and no repeated episodes of decompensation of extended duration.  (Tr. 73).

In support of his opinion Dr. Grutkowski wrote that the outpatient therapy at

CONCERN since November 18, 2011, demonstrated diagnoses of bipolar I

disorder and social anxiety disorder, no suicidal or homicidal ideation and one

hospitalization in 1998 for suicidal ideation.  (Tr. 74).  Dr. Grutkowski stated that

the ADLs demonstrate that Plaintiff "relates well with authority."  (Tr. 74).  Dr.

Grutkowski noted that there was no medical opinion evidence that he reviewed.

(Tr. 74).

Dr. Grutkowski opined that Plaintiff did not have any limitations in memory or in "sustained concentration and persistence." (Tr. 75-76). Dr. Grutkowski opined that Plaintiff did have social interaction limitation which included a moderate limitation in the ability to interact appropriately with the general public and was not significantly limited in the ability to: 1) ask simple questions or request assistance; 2) accept instructions and respond appropriately to criticism from supervisors; 3) along with coworkers or peers without distracting them or ex hi bi ting behavioral extremes; and, 4) maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. (Tr. 75-76). In explanation for the opinion Dr. Grutkowski wrote "social anxiety reported" and "able to interact." (Tr. 75). Dr. Grutkowski also said that Plaintiff was able to perform simple repetitive tasks. (Tr. 75). Dr. Grutkowski also opined that Plaintiff's limitations would not prevent Plaintiff from performing past relevant work as a cashier. (Tr. 77).

### III.   Legal Standards and Plaintiff's Alleged Errors

To receive benefits under the Act, a claimant must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12

months."  42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A).  The Act requires

that a claimant for disability benefits show that:

> He is not only unable to do his previous work but cannot, considering
> his age, education, and work experience, engage in any other kind of
> substantial gainful work which exists in the national economy,
> regardless of whether such work exists in the immediate area in which
> he lives, or whether a specific job vacancy exists for him, or whether
> he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The ALJ uses a five-step evaluation process to determine if a person is

eligible for disability benefits.  *See* 20 C.F.R. § 404.1520.  The ALJ must

sequentially determine: (1) whether the claimant is engaged in substantial gainful

activity; (2) whether the claimant has a severe impairment; (3) whether the

claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part

404, Subpart P, Appendix 1 ("Listing"); (4) whether the claimant's impairment

prevents the claimant from doing past relevant work; and (5) whether the

claimant's impairment prevents the claimant from doing any other work.  *See* 20

C.F.R. §§ 404.1520. Before step four in this process, the ALJ must also determine

Plaintiff's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e).

The disability determination involves shifting burdens of proof.  The

claimant bears the burden of proof at steps one through four.  If the claimant

satisfies this burden, then the Commissioner must show at step five that jobs exist

in the national economy that the claimant can perform.  *Mason v. Shalala*, 994

F.2d 1058, 1064 (3d Cir. 1993). The ultimate burden of proving disability under the Act lies with the claimant. *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

With due deference to the Commissioner's construction of social security rulings and regulations, the court may reverse the Commissioner's final determination if the ALJ did not properly apply the legal standards. *See* 42 U.S.C. § 405(g) ("court shall review only the question of conformity with such regulations and the validity of such regulations"); *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166-67 (2012) (deference to agency interpretation of its own regulations); *Sanfilippo v. Barnhart*, 325 F.3d 391, 393 (3d Cir. 2003) (plenary review of legal questions in social security cases); *see also Witkowski v. Colvin*, 999 F. Supp. 2d 764, 772-73 (M.D. Pa. 2014) (citing *Poulos v. Commissioner of Social Security*, 474 F.3d 88, 91 (3d Cir. 2007)). The court may also reverse the Commissioner or substantial evidence does not support the ALJ's decision. *See* 42 U.S.C. § 405(g); *see also Johnson v. Commissioner of Social Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir.1986). Substantial evidence is a deferential standard of review. *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v.*

*Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Substantial evidence is "less than a preponderance" and "more than a mere scintilla." *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

## A.  Plaintiff's Non-Compliance

The ALJ drew improper inferences from Plaintiff's non-compliance with treatment and such improper inferences amounted to error with the ALJ's credibility determinations and weight allotted to the opinions of Plaintiff's treatment providers.

Where a medically determinable physical or mental impairment that could reasonably be expected to produce the individual's pain or other symptoms, however, the severity of which is not substantiated by objective medical evidence, the ALJ must make a credibility finding on the claimant's subjective statements. SSR 96-7p.  The credibility finding must be based on a consideration of the entire case record.  SSR 96-7p.  In determining a claimant's credibility regarding the severity of symptoms, the ALJ must consider the following factors in totality: 1) the extent of daily activities; 2) the location, duration, frequency, and intensity of pain or other symptoms; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of any medication; 5) treatment other than

medication for the symptoms; 6) measures used to relieve pain or other symptoms;

and, 7) other factors concerning functional limitations and restrictions due to pain

or other symptoms.  SSR 96-7p; 20 C.F.R. §§ 404.1529, 416.929; *accord Canales*

*v. Barnhart*, 308 F. Supp. 2d 523, 527 (E.D. Pa. 2004).

> With regards to Plaintiff's non-compliance, the ALJ wrote:

> Considering the [Plaintiff's] consistent yet minimal mental health
> treatment, *problems with compliance with prescribed treatment*, good
> GAF scores that have remained fairly stable, and broad activities of
> daily living, the undersigned finds the State agency psychological
> consultant's opinions relatively persuasive and thus affords them
> moderate weight.

(Tr. 18) (emphasis added).  The ALJ added:

> Related to compliance, the undersigned notes that Dr. Babbar reported
> [Plaintiff's] psychological symptoms were resistant to medication
> therapy and the record does support that [Plaintiff's] symptoms have
> not been resolved with medication. However, the record documents
> [Plaintiff's] sources have prescribed individual therapy but [Plaintiff]
> has refused to participate in therapy. Thus, [Plaintiff's] resilient
> psychological symptoms have not been adequately treated according
> to his medical sources due to noncompliance. Therefore, the
> undersigned gives moderate weight to Dr. Babbar's statement.

(Tr. 24).  The ALJ also stated:

> Tracking [Plaintiff's]GAF in the context of his medical treatment
> shows a strong correlation between [Plaintiff's] compliance with
> prescribed treatment and his GAF score that mirrors his estimated
> level of mental functioning. Considering the claimant's relatively
> good mental status examinations, response to minimal treatment, and
> broad activities of daily living, the undersigned affords moderate
> weight to the collected opinions on the claimant's GAF.

(Tr. 25).

It is error to draw adverse inferences from a claimant's failure to comply with treatment without addressing whether the non-compliance was due to his or her mental illness. *See e.g.*, SSR 96-7p (stating that an adjudicator must not draw any inferences about an individual's symptoms from a failure to pursue regular medical treatment without first considering any explanations); *Pate-Fires v. Astrue*, 564 F.3d 935, 945-47 (8th Cir. 2009); *Mendez v. Chater*, 943 F.Supp. 503, 508 (E.D. Pa.1996) (citing *Sharp v. Bowen*, 705 F.Supp. 1111, 1124 (W.D. Pa.1989)); *Voorhees v. Colvin*, No. 3:13-CV-02583-GBC, 2015 WL 5785830, at *18–20 (M.D. Pa. Sept. 30, 2015).

The United States Court of Appeals for the Eighth Circuit has observed that "federal courts have recognized a mentally ill person's noncompliance with psychiatric medications can be, and usually is, the 'result of [the] mental impairment [itself] and, therefore, neither willful nor without a justifiable excuse.'" *Pate-Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir. 2009) (quoting *Mendez v. Chater*, 943 F.Supp. 503, 508 (E.D. Pa. 1996); *see also Robinson v. Barnhart*, 366 F.3d 1078, 1083-84 (10th Cir. 2004); *Hennion v. Colvin*, No. 3:13-CV-00268, 2015 WL 877784, at *24 (M.D. Pa. Mar. 2, 2015); *Sweeney v. Comm'r of Soc. Sec.*, 847 F. Supp. 2d 797, 807 n. 14 (W.D. Pa. 2012). The Eighth Circuit further observed that "[c]ourts considering whether a good reason supports a claimant's failure to comply with prescribed treatment have recognized psychological and emotional

difficulties may deprive a claimant of the rationality to decide whether to continue treatment or medication." *Pate-Fires v. Astrue*, 564 F.3d 935, 945-46 (8th Cir. 2009) (internal quotation marks omitted).   Courts have acknowledged that noncompliance with treatment is especially prevalent among patients with bipolar disorder. *See e.g.*, *Kangail v. Barnhart*, 454 F.3d 627, 630-31 (7th Cir. 2006); *Sweeney v. Comm'r of Soc. Sec.*, 847 F. Supp. 2d 797, 807 n. 14 (W.D. Pa. 2012); *Pounds v. Astrue*, 772 F. Supp. 2d 713, 723 n. 21 (W.D. Pa. 2011) (observing that "non-compliance is a hallmark of bipolar disorder, particularly when the person is in the manic phase"); *Howard v. Astrue,* 2010 WL 1372662, at *6 n. 2 (W.D.Okla. Mar. 9, 2010) (noting that "[n]oncompliance with medication is a very common feature among bipolar patients. Rates of poor compliance may reach 64% for bipolar disorders, and noncompliance is the most frequent cause of recurrence.") (internal quotations and citations omitted).   The United States Court of Appeals for the Seventh Circuit has explained:

> [I]t is true that bipolar disorder is treatable by drugs. But mental illness in general and bipolar disorder in particular (in part because it may require a complex drug regimen to deal with both the manic and the depressive phases of the disease) may prevent the sufferer from taking her prescribed medicines or otherwise submitting to treatment. The administrative law judge did not consider this possibility.

*Kangail v. Barnhart*, 454 F.3d 627, 630-31 (7th Cir. 2006) (internal citations omitted).   In *Pate-Fires*, the Eighth Circuit determined that substantial evidence did not support an ALJ's determination that the plaintiff's noncompliance was due

to her free will when doctors opined that her judgement and insight were impaired and she was suffering from '[v]ague and paranoid delusions;' the plaintiff stated that she did not like the side effects, and explained that she discontinued her medication because she felt that she did not need them. *Pate-Fires v. Astrue*, 564 F.3d 935, 946 (8th Cir. 2009).

The record demonstrates that Plaintiff has a history of mental health challenges and poor insight and judgement regarding his medical choices and interactions with treatment providers.

For example, on April 18, 2008, Plaintiff reported that he improved with his insight regarding "misperceptions" of other people's actions being directed at him (Tr. 521), which indicates that his insight has been a problem. Also, on April 22, 2010, Dr. August noted that Plaintiff's mind races, he has problems with poor judgment, he may develop paranoid thoughts at times, he is always anxious, and he worries excessively about a variety of things that he really does not need to worry about. (Tr. 388). On August 23, 2012, Ms. Fairchild-Pitcher observed that Plaintiff "verbalizes a pervasive distrust of others and is consumed with thoughts of others trying to deceive or mistreat him," and "is constantly preoccupied with unjustified doubts about the trustworthiness or abilities of others." (Tr. 439). Ms. Fairchild-Pitcher opined that Plaintiff "misreads others and often feels people are laughing at him or talking about him," and that he "also shows symptoms of

obsessive compulsive personality disorder and dependent personality traits." (Tr. 439).   Ms. Fairchild-Pitcher opined that treatment should "more importantly," focus on "his faulty thought process." (Tr. 439).   On March 12, 2013, it was noted that Plaintiff had poor judgement and insight with a tangential thought process. (Tr. 588).

Plaintiff's poor judgement and insight is also shown in his medical decisions and interactions with his treatment providers.   For example, records demonstrate that despite Plaintiff having severe adverse responses to Abilify, he continues to request a prescription for the medication.   On January 13, 2006, Plaintiff stated that his Abilify was discontinued due to restlessness and it was noted that he decompensated with Abilify.   (Tr. 462).   However, on February 28, 2008, Plaintiff requested samples of Abilify and were provided some.   (Tr. 521).   Then on April 22, 2010, Dr. August noted that Plaintiff reported that his symptoms had improved after stopping Abilify and opined that Plaintiff was likely suffering from the side-effect of akathisia due to Abilify.   (Tr. 388).   Again on April 25, 2012, Plaintiff indicated that he wanted to try Abilify and Dr. Shapiro wrote a prescription for Abilify.   (Tr. 397).

Moreover, the well documented problems with Abilify in addition to very frequent adjustments to Plaintiff's medication (where there is rarely a couple of months that pass without Plaintiff's medications being titrated or changed),

undercuts the ALJ's reasoning (quoted above) for giving less weight to the October 2013 opinion of Dr. Babbar that Plaintiff has responded poorly to medications. (Tr. 24).[2]  *See* 20 C.F.R. pt. 404, subpart P, app. 1, § 12.00(C)(4) ("Episodes of decompensation may be inferred from medical records showing significant alteration in medication"); *Larson v. Astrue*, 615 F.3d 744, 750 (7th Cir. 2010) (discussing that the listing recognizes that an episode of decompensation may be inferred from medical records showing a significant alteration in medication, and the plaintiff had "a long history of problems that have led to significant alterations in her medications"); *McCoy v. Colvin*, No. 3:15-CV-00629, 2016 WL 3031826, at *7 (M.D. Pa. May 25, 2016) ("[the plaintiff's] medication regimen underwent frequent and significant changes, from which a factfinder might infer a more serious impairment or one or more episodes of decompensation"); *see also Davis v. Astrue*, 830 F. Supp. 2d 31, 47 (W.D. Pa. 2011) (where there has been no frequent changes in the medications, "it could be inferred that this treatment was effective"); *Phillips v. Astrue*, 413 F. App'x 878, 886 (7th Cir. 2010) (discussing episodes of decompensation can be inferred from a significant alteration in

---

[2] Plaintiff's frequently changing medications and the example with Abilify also undercuts the ALJ's reasoning for giving little weight to the opinion of Ms. Reeves regarding the side-effects of Plaintiff's medications (Tr. 24-25).  Moreover, while the ALJ stated that Ms. Reeves had little insight to Plaintiff's functioning because she does not live with him, the records indicate that Plaintiff talks to his mother for twenty minutes a day for about five times a week.  (Tr. 395).  Finally, there is no requirement that an "other source" statement must be from an individual that lives with the claimant.  SSR 06-03p.  Social Security Ruling 06-03p lists possible sources which include "siblings, other relatives, friends, neighbors, clergy, and employers."  *See* SSR 06-03p.

medication and that it was "puzzling" that "despite this overwhelming medical evidence, the ALJ seized on the one outlier opinion in the record and this from a nonexamining source").

Plaintiff's outbursts and poor judgement have been documented throughout the record.  A report dated January 6, 2006, noted that Plaintiff was calling on a daily basis demanding to speak with a nurse and refusing to leave messages, yelled at staff, demanded to have staff interrupt a session to speak with him, called and used profanity toward a secretary, and threatened to discontinue treatment.  (Tr. 459-60).  It was noted that Plaintiff had been calling and harassing at various offices.  (Tr. 460).  On October 25, 2006, Plaintiff reported increased angry outbursts and exhibited a verbal outburst in the waiting room.  (Tr. 482).  In a report dated December 21, 2006, it was noted that Plaintiff was overreacting during the call and "scream[ed] 'I'm tired of this run around.'"  (Tr. 487).  On November 18, 2011, it was noted that Plaintiff experienced problems with dealing with people, precarious nature of conversations, temper/anger management, utilizing coping skills when experiencing anxiety/social relations, and trust issues. (Tr. 392).  Plaintiff reported a history of frequent temper loss if something does not go as planned or if something is not as simple as expected.  (Tr. 393).  Plaintiff also reported a history of aggression which included verbal threats made out of anger, yelling, swearing, and arguing.  (Tr. 393).

Based on the foregoing, the Court concludes that the ALJ erred in drawing an adverse inference from Plaintiff's non-compliance with treatment and thus the ALJ erred in the allocation of weight to the abovementioned opinion evidence, to the extent that the ALJ denied weight based on Plaintiff's non-compliance with treatment.

## B. Work History

The Court finds that the ALJ erred in drawing an adverse inference from Plaintiff's work history. The ALJ concluded:

> Furthermore, the undersigned finds the claimant's work history diminishes the credibility of the overarching allegation of the inability to perform any substantial gainful activity. While [Plaintiff]did report being fired from jobs because of social problems, he also testing that a number of his past positions ended to non-medical reasons, including apathy towards paying his travel expenses, seasonal employment, and business closure.

(Tr. 26). Earnings reports demonstrate that Plaintiff has worked several jobs of short duration with a number of employers. (Tr. 186-99); Pl. Brief at 36-37.

Under ruling 96-7p, a credibility determination of an individual's statements about pain or other symptoms and about the effect the symptoms can be based on "[s]tatements and reports from the individual and from treating or examining physicians or psychologists and other persons about . . . prior work record and efforts to work . . . ." SSR 96-7p; *see also Dobrowolsky v. Califano*, 606 F.2d 403

(3d Cir. 1979) (Work history is a proper consideration in the credibility assessment).

The inferences drawn from a claimant's work history vary depending on the facts. *See e.g.*, *Dobrowolsky v. Califano*, 606 F.2d 403, 409 (3d Cir. 1979) (holding that a claimant's testimony "is entitled to substantial credibility" where the claimant has a lifetime record of continuous work); *Ford v. Barnhart*, 57 F. App'x 984, 988 (3d Cir. 2003) (finding no error where an ALJ made an adverse credibility determination based on erratic pre-onset work history); *Crotsley v. Astrue*, No. CIV.A. 3:10-88, 2011 WL 5026341, at *4 (W.D. Pa. Oct. 21, 2011) (an inference of a lack of motivation to work can be drawn from a sporadic work history prior to disability onset); *Collins v. Astrue*, No. CIV.A. 11-1275, 2012 WL 2930885, at *11 (W.D. Pa. July 18, 2012) (an inference of a lack of motivation to work can be drawn from a sporadic work history prior to disability onset); *Henderson v. Astrue*, No. CIV.A. 10-1638, 2011 WL 6056896, at *6 (W.D. Pa. Dec. 6, 2011) (post onset part-time work could support a finding of non-disability); *Leidler v. Sullivan*, 885 F.2d 291, 294 (5th Cir. 1989) (sporadic work-history as evidence of mental impairment); *Smith v. Heckler*, 735 F.2d 312, 318 (8th Cir. 1984) (finding error where ALJ determined that a claimant lacked motivation, however, the ALJ failed to address claimant's history of work attempts and

testimony which supported that claimant simply lacked basic mental ability to follow directions without constant supervision).

The Court finds that while the ALJ noted instances where Plaintiff cited non-disability reasons for the end of employment, the ALJ failed to adequately address Plaintiff's work history and desire to work in the context of the longitudinal picture of Plaintiff's overall failed work attempts. *See Tennant v. Schweiker*, 682 F.2d 707, 709 (8th Cir. 1982) (holding that the plaintiff's personality disorder rendered him unable to engage in substantial gainful employment and required a finding of disability where the plaintiff held 46 jobs in twelve years, his longest tenure was six months, and he was fired from most of these jobs). Thus it is crucial for an ALJ to explicitly weigh all relevant, probative, and available evidence; and provide some explanation for a rejection of probative evidence which would suggest a contrary disposition. *See Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994); *Smith v. Califano*, 637 F.2d 968, 971-72; *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (addressing the context of mental health disability and drawing inferences from report of activities).

## C. Weight of Dr. August's January 2012 Opinion

Plaintiff asserts that the ALJ erred in the allocation of weight to Plaintiff's treating physicians Drs. Babbar, Shapiro, and August. Pl. Brief at 25-33. The ALJ wrote that:

Dr. August's May 2010 opinion is a very passive and half-hearted endorsement of disability that is in contrast with his June 2010 opinion that the claimant is able to work. The flightiness of Dr. August's opinions make both of these opinions of limited value in his claim for disability, as they appear to be based upon the claimant's functioning at the very time he made them. Dr. August's last opinion, which is an endorsement of disability due to a likelihood of "annoying" his boss and co-workers appears to have been made just as hastily as his first two opinions. With the exception of the claimant presenting to this appointment with his mother, who reported he had been engaged in peculiar behavior recently, and the claimant's subjective complaints of the inability to obtain employment because he acted strange, there is no documented basis for Dr. August to have again reversed course in his opinion on the claimant's ability to work. The undersigned notes that with this change in opinion, the claimant's mental status examinations were not significantly different nor was GAF score decreased because of his opinion. The undersigned finds the contrast between a GAF of 60 and suggestion of the inability to work because of "annoying" others it reconcilable. Therefore, the undersigned gives Dr. August's oscillating opinions slight weight.

(Tr. 22).

After an ALJ concludes that pursuant to paragraph (c)(2) the treating source is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "inconsistent with the other substantial evidence" (which includes non-medical evidence) then the ALJ can consider the remaining paragraph (c) factors to allocate weight between the different medical opinions. 20 C.F.R. §§404.1527(c), 416.927(c). Generally, there is a hierarchy of weight allotted between three types of physician opinions: opinions of those who treat the claimant (treating physicians) are given more weight than opinions by those who examine but do not treat the claimant (examining physicians), and the opinions of

examining physicians are given greater weight than the opinions of those who neither examine nor treat the claimant (non-examining physicians). *See* 20 C.F.R. §§ 404.1527(c)(1)-(2), 416.927(c)(1)-(2).   Once an ALJ determines that pursuant to paragraph (c)(2) controlling weight is not warranted for a treating source opinion, the ALJ can then allocate weight between treating source opinions and examining non-treating physician opinions.  *See* 20 C.F.R. §§ 404.1527(c)(1)-(2), 416.927(c)(1)-(2).

In "appropriate circumstances" an ALJ may apply paragraphs (c)(3) through (c)(6) to assign less weight to a treating source opinion in favor of a non-treating, non-examining medical opinion.  *See* SSR 96-6p[3]; 20 C.F.R. §§ 404.1527(c), 416.927(c).   Although not defining "appropriate circumstances," SSR 96-6p provides as an example that:

> the opinion of a State agency medical or psychological consultant or other program physician or psychologist may be entitled to greater weight than a treating source s medical opinion if the State agency medical or phychological [sic] consultant's opinion is based on a review of a complete case record that includes a medical report from a specialist in the individual's particular impairment which provides more detailed and comprehensive information than what was available to the individual's treating source.

SSR 96-6P.   This example does not constitute the only possible appropriate circumstance to assigning greater weight than a treating medical opinion, but the

---

[3] The ALJ is bound by SSR 96-6p. *See* 20 C.F.R. § 402.35(b)(1) (Social Security Rulings are "binding on all components of the Social Security Administration").

phrase "appropriate circumstances" should be construed as a similarly compelling reason. *See Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 223, 128 S. Ct. 831, 838, 169 L. Ed. 2d 680 (2008) ("when a general term follows a specific one, the general term should be understood as a reference to subjects akin to the one with specific enumeration"). The example suggests that even an opinion of an agency physician that is based on a reinterpretation of the same evidence considered by the treating source physician is insufficient to grant the agency opinion greater weight over that of the treating source opinion. *See* SSR 96-6P. The example in Rule 96-6P suggests that for an agency physician opinion to be granted more weight than the treating source opinion, the agency opinion, there needs to be additional material evidence that was not considered by the treating source physician. *See* SSR 96-6P. In sum, if a treating source opinion is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "inconsistent with the other substantial evidence" (which includes non-medical evidence), and "appropriate circumstances" do not exist, then the ALJ lacks substantial evidence to find that a non-examining physician opinion outweighs a treating source opinion pursuant to 20 C.F.R. 404.1527(c)(2).

If a non-examining source precedes material medical evidence or precedes a materially different treating source opinion, the ALJ would be required to reinterpret the medical record following the non-examining source opinion in order

to reject a treating source opinion.  Consistent with 96-6p, the Third Circuit has not

upheld, in a precedential decision, where a treating source opinion in outweighed

by only a single non-treating, non-examining medical opinion from a source who

did not review the entire case record.  *See Brown v. Astrue*, 649 F.3d 193 (3d Cir.

2011); *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500 (3d Cir. 2009); *Brownawell v.*

*Comm'r Of Soc. Sec.*, 554 F.3d 352, (3d Cir. 2008); *Morales*, 225 F.3d at 317.[4]

Since sections 404.1527(c)(2) and 416.927(c)(2) were promulgated, the only

precedential case affirming an ALJ who rejected a treating source medical opinion

was *Brown*, where the ALJ relied on two consistent medical opinions to reject the

treating source medical opinion, one from an expert who reviewed the complete

record through the hearing date.  *See Brown*, 649 F.3d at 196.

In *Brownawell* and *Morales*, the Third Circuit held that a single non-

treating, non-examining medical opinion was not sufficient to reject a treating

source medical opinion.  *See Brownawell*, 554 F.3d at 352; *Morales*, 225 F.3d at

317.  *Morales* emphasized that the non-treating, non-examining source reviewed

---

[4] Congress has since amended the Act to require medical expert review of the medical evidence for any claimant who establishes any medically determinable impairment. *See* BIPARTISAN BUDGET ACT OF 2015, PL 114–74, November 2, 2015, 129 Stat 584, § 832(a). This amendment recognizes that medical evidence requires review by an individual with medical training, rather than lay interpretation. *See also North Haven Board of Education v. Bell*, 456 U.S. 512, 535, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982) ("Although postenactment developments cannot be accorded 'the weight of contemporary legislative history, we would be remiss if we ignored these authoritative expressions") (quoting *Cannon v. Univ. of Chi.*, 441 U.S. 677, 686 n. 7, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979)); (*INS v. Cardoza–Fonseca*, 480 U.S. 421, 430, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987)).

an incomplete case record.  *See Morales*, 225 F.3d at 314 (non-treating, non-examining source "review[ed] [claimant's] medical record which . . . did not include [two physicians'] reports").  In *Brownawell*, an examining source opinion corroborated the treating source medical opinion.  In *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500 (3d Cir. 2009), there were three non-treating medical opinions and one treating medical opinion, but the Court held that the non-treating medical opinions did not provide good enough reason to reject the treating source medical opinion because they were "perfunctory" and omitted significant objective findings.  *Id*. at 505.

With regard to the inconsistencies with the treating source opinion, the ALJ had a duty to recontact Dr. August.  As the Administration explained:

> Some commenters were concerned that the proposed language of §§ 404.1527(b) and (c), and 416.927(b) and (c) permitted us to discount a treating source's apparently unsupported opinion without recontacting the source, and that the rules placed highly restrictive conditions on obtaining additional information from treating sources.

> Response: To the contrary, recontact with treating sources to complete the case record and to resolve any inconsistencies in the evidence is one of the principal provisions of this set of rules. See §§ 404.1512(d) and 416.912(d) of these final regulations. Far from being restrictive, the intent of these rules is to require such contacts.

Standards for Consultative Examinations and Existing Medical Evidence, 56 FR 36932–01, 36951–36952; *see also* 20 C.F.R. § 404.1512(d) ("We will make every reasonable effort to help you get medical reports from your own medical sources

when you give us permission to request the reports"); SSR 96-5p ("Because treating source evidence (including opinion evidence) is important, if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator must make 'every reasonable effort' to recontact the source for clarification of the reasons for the opinion"). There is no evidence in the record that the ALJ attempted to recontact Dr. August.

Moreover, the ALJ gives the non-examining August 2012 opinion Dr. Grutkowski "moderate" weight (Tr. 18, 20), while according the opinions of Dr. August "slight" weight (Tr. 22). Dr. Grutkowski's August 2012 opinion has a list of records considered which omits any mention of the lengthy records from Northern Tier Counseling or Tioga Counseling Center during the relevant time period. (Tr. 71-72). Dr. Grutkowski indicated that the Psychiatric Review Technique was for the period leading up to Plaintiff's date of last insured of December 31, 2011, and, therefore, does not address the period after the date of last insured which would address Plaintiff's Title XVI claim. (Tr. 72, 75). Dr. Grutkowski noted that there was no medical opinion evidence that he reviewed. (Tr. 74).

The ALJ has not provided "good reasons" or identified "appropriate circumstances" to assign greater weight to the non-examining August 2012 of Dr.

Grutkowski over that of Dr. August.  *See Burns v. Colvin*, No. 1:14-CV-1925, 2016 WL 147269 (M.D. Pa. Jan. 13, 2016); *Tilton v. Colvin*, No. 1:14-CV-02219-YK-GBC, 2016 WL 1580003, at *5-10 (M.D. Pa. Mar. 31, 2016), *report and recommendation adopted*, No. 1:14-CV-2219, 2016 WL 1569895 (M.D. Pa. Apr. 19, 2016); *see also Kreiser v. Colvin*, No. 3:15-CV-1603, 2016 WL 704957, at *13 (M.D. Pa. Feb. 23, 2016) (Noting that expert "reviewed records . . . through November 2012" and "the record does not appear to contain….treatment records which post date [the expert's] opinion"); *Garcia v. Colvin*, No. 3:15-CV-0171, 2016 WL 1695104, at *15 (M.D. Pa. Apr. 26, 2016) (Nealon, J.) (Remanding because the ALJ erred in relying on non-examining, non-treating physician where "the entire medical record was not available to the non-examining, non-treating physician").

///

///

///

///

///

///

///

///

## A.   Other Allegations of Error[5]

Because the Court recommends remand on these grounds, it declines to address Plaintiff's other allegations. A remand may produce different results on these claims, making discussion of them moot. *See LaSalle v. Comm'r of Soc. Sec.*, No. CIV.A. 10-1096, 2011 WL 1456166, at *7 (W.D. Pa. Apr. 14, 2011).

## B.   Remedy

Remand, rather than reversal and award of benefits, is the appropriate remedy in this case. *See Markle v. Barnhart*, 324 F.3d 182, 189 (3d Cir. 2003) ("[T]he proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation") (internal quotations omitted)).

---

[5] Plaintiff's counsel, once again, contends that the ALJ was biased and failed in fulfilling his duty to develop the record.  Pl. Brief 33-34, 40; *see also Pacifico v. Colvin*, No. 1:14-CV-1280, 2015 WL 5695271, at *9–11 (M.D. Pa. Sept. 28, 2015); *Taylor v. Colvin*, 3:13-cv-02693-MWB-GBC, at ECF No. 16, 22. (M.D. Pa.).  In previous cases, the Court has directed counsel to the United States Supreme Court Case *Liteky v. United States*, 510 U.S. 540, 555 (1994) regarding the standard to establish bias and has explained that "given the high standard to substantiate judicial bias . . . an adjudicator's lack of sufficient development does not automatically equal bias . . . [a]n adjudicator's failure to meet a duty to develop could be due to mistake or negligence and not necessarily demonstrate 'deep-seated favoritism or unequivocal antagonism that would make fair judgment impossible.'"  *Pacifico v. Colvin*, No. 1:14-CV-1280, 2015 WL 5695271, at *9 (M.D. Pa. Sept. 28, 2015) (quoting *See Liteky v. United States,* 510 U.S. 540, 555). "Counsel is cautioned in future cases to be mindful that '[a] lawyer *shall not knowingly...* fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client....'"  *United States v. Garrett,* 504 Fed. Appx. 132, 135 n.1 (3d Cir. 2012) (citing Pa. Rule of Prof. Conduct 3.3(a)(2)) (emphasis added); *see also In re Terry*, No. BR 13-14780-MDC, 2015 WL 1321486, at *5 (Bankr. E.D. Pa. Mar. 13, 2015); Hon. Elaine Bucklo, *The Temptation Not to Disclose Adverse Authority*, Litigation, Winter 2014, at 26 (discussing obligation in citing unfavorable but not precedential cases that addressed the exact legal argument previously presented by attorney).

## IV.   Conclusion

The undersigned recommends that the Court vacate the decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and remand the case for further proceedings.

Accordingly, it is HEREBY RECOMMENDED:

1.    The decision of the Commissioner of Social Security denying Plaintiff's benefits under the Act be vacated and the case remanded to the Commissioner of Social Security to develop the record fully, conduct a new administrative hearing and appropriately evaluate the evidence.

2.    The Clerk of Court close this case.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a Magistrate Judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A Judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The Judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The Judge may also receive

further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

Dated: August 22, 2016 _____s/Gerald B. Cohn_____

GERALD B. COHN
UNITED STATES MAGISTRATE JUDGE